**The PEOPLE of the State of Colorado, Complainant,**

v.

**William J. BARNTHOUSE, Attorney–Respondent.**

**No. 97SA299.**

Supreme Court of Colorado, En Banc.

Nov. 24, 1997.

Linda Donnelly, Disciplinary Counsel, James S. Sudler, Assistant Disciplinary Counsel, Denver, for Complainant.

Craig L. Truman, Denver, for Attorney–Respondent.

PER CURIAM.

This is a lawyer discipline case. A hearing panel of the supreme court grievance committee approved the findings of a hearing board, but modified the board's recommendation of discipline to a suspension for one year and one day. Neither the respondent nor the complainant has excepted to the panel's action. We accept the hearing panel's rec-

ommendation and order that the respondent be suspended for one year and one day.

## I.

The respondent was admitted to the practice of law as a member of the Bar of this court in 1976. Based on the evidence presented, the hearing board made the following findings by clear and convincing evidence.

On March 11, 1995, the respondent went to Optical Matters, a store selling eyeglasses in Littleton, Colorado, which is owned and operated by Hamid Zarrin. The respondent had been to Optical Matters before when it was managed by Zarrin's cousin, Mani Vaghedi. Zarrin told the respondent that his cousin now worked at another store, Optical Masters, and he gave the respondent the telephone number of the other store.

The respondent asked Zarrin for copies of prescriptions for himself and his son, which were on file at the store. Zarrin and his assistant were quite busy at the time, a Saturday afternoon, and the only assistance provided the respondent was to give him his file and the copies of the prescriptions requested.

While he was at the store, the respondent looked at different eyeglass frames and he selected three designer frames, worth a total of $527.00 before tax. The respondent did not speak with Zarrin about purchasing the frames, and he left the store with the frames in his possession. The respondent did not pay for the frames. Neither Zarrin nor his assistant actually saw the respondent take the frames from the store, but about twenty minutes after the respondent left, Zarrin checked the stock, as he did several times a day, and found that eleven frames were missing.

Later that afternoon, the respondent called Optical Masters and asked Vaghedi about the price of lenses. The respondent arrived at Optical Masters shortly before they closed, and he gave Vaghedi the three pairs of frames he had taken from the other store, as well as the copies of his and his son's prescriptions. One of the prescriptions carried the Optical Matters logo. The respondent asked Vaghedi to put the appropriate lenses in the frames. He did not ask for any other assistance.

Vaghedi was surprised that the respondent wanted lenses installed in one of the frames which already had expensive mirror-coated lenses in it. In addition, he recognized all three pairs of frames as coming from Optical Matters, and he knew that Optical Matters advertised extensively that it would install lenses for free with the purchase of a frame. However, he did not ask the respondent why he did not take advantage of the offer.

The respondent remained in the store trying on various frames after giving Vaghedi the three frames and prescriptions. At one point, Vaghedi saw the respondent try on a pair of frames and then put them in his pocket. He did not confront the respondent about the theft, however, and the respondent left the store as Vaghedi was preparing to close.

After the respondent left, Vaghedi called his cousin at Optical Matters and told him that the respondent had brought in three pairs of frames that were of a design similar to those carried by Optical Matters and he asked whether the respondent had purchased them there. Zarrin told him that the three sets the respondent had brought to Vaghedi were among those missing from his store. Zarrin and Vaghedi then contacted the police and reported several pairs of frames missing. The exact number missing is in dispute, but the complainant concedes there is no proof that the respondent took any more from Zarrin's store than the three the respondent admits were in his possession and that he gave to Vaghedi.

Vaghedi called the respondent later that evening to confirm that the respondent had given him the correct phone number. The respondent answered the phone and recognized Vaghedi's voice. Vaghedi then identified himself and spoke briefly with the respondent.

The following Monday, March 13, 1995, the respondent called Vaghedi and confirmed that his glasses were ready. When he arrived at Optical Masters, the police placed the respondent under arrest. Although he denied taking any frames from Vaghedi's

store, he declined to speak with the police about the thefts from Zarrin's store.

Two weeks after the respondent's arrest, on March 27, 1995, while in his store, Zarrin discovered a check dated March 11, 1995, in the amount of $594.39, payable to Optical Matters, drawn on the account of ILF, LLC, and signed by the respondent. "ILF" stands for "International Law Firm," and the account belongs to the respondent.

On March 11, 1995, the balance in the ILF, LLC account was $196.31. Four days later, two days after the respondent's arrest for theft, two deposits totaling $4,700 were made to the account. The deposit slips presented with the March 15 deposit were completed by the respondent and were dated March 9, and March 10, 1995. The respondent's check register for that account shows five additional checks were written between the end of January 1995 and March 12, 1995. None of these checks was presented to the respondent's bank for payment until March 20 or later.[1]

The respondent admits that he took three pairs of eyeglass frames from Optical Matters, but testified, under oath, that he paid for them. He contends that he and his common-law wife, Linda Olmstead, were running errands together when they stopped at Zarrin's store, and he went in alone. The respondent asserts that he intended to buy eyeglasses for himself and for his son. He told the hearing board that he took three pairs of eyeglasses that needed repairs with him, and he placed them in his pants pocket. While at Optical Matters, the respondent contends that he calculated the amount due for the three sets of frames in question, plus tax (which was incorrect), wrote a check for that amount, and left the check on top of a file that Zarrin showed him. According to the respondent, he assumed that his invoice for the frames was with the prescriptions Zarrin gave him.

Olmstead testified that when the respondent returned to their car he handed her his checkbook and she saw a carbon for a check payable to Optical Matters in the amount of $594.39. The respondent told the hearing board that he did not know Optical Matters would install lenses for free in their own frames, and that he felt more comfortable doing business with Vaghedi as he trusted him to install the lenses at a reasonable price. The respondent denies that he took any frames from Vaghedi's store. He admits that he put frames in his pocket while at the store, but asserts that they were his own frames that he brought in for repair. Nevertheless, the respondent did not speak with either Vaghedi or Zarrin about the frames he wanted repaired, the very reason for his visit to Optical Matters in the first place.

The hearing board found the respondent's testimony regarding his version of the events "incredible." First, the board concluded that it was illogical that a person would make a purchase of over $500, calculate the applicable tax on his own, and leave a check without advising anyone at the store of what he was doing. The board determined that the check was actually left at the store by either the respondent or someone acting on his behalf, days after the respondent was arrested for theft. Moreover, the board was troubled by the respondent's failure to ask either Zarrin or Vaghedi about repairing the frames he says he brought into the store.

---

1. According to the respondent's checkbook and bank records, check No. 1007 was written on January 4, 1995, payable to National Geographic in the amount of $16.45. It was not presented for payment at the respondent's bank until March 23, 1995, ten days after the respondent's arrest. Check No. 1008, dated February 24, 1995, made payable to the Denver Post in the amount of $35.10, was presented for payment on March 22. Check No. 1009 was made payable to U S WEST in the amount of $38.77, dated March 5, 1995, and was presented to the respondent's bank on March 20, 1995. A second check payable to U S WEST, No. 1010, for $92.55 and dated March 11, 1995, was also presented for payment on March 20. Check No. 1011 in the amount of $594.39, payable to Optical Matters, was dated March 11. Finally, check No. 1012, made out to Denver Water for $39.74, and dated March 12, 1995, was presented for payment on March 24, 1995. Thus, checks which the respondent claimed were written between January 4 and March 12, 1995, a sixty-seven day period, were all presented for payment within a four-day period, and all after the respondent had been arrested and charged with theft. The record before us does not reveal if the invoices upon which the checks were presumably based are consistent with the dates on the checks.

The board also found disconcerting the evidence pertaining to the respondent's checking account. For one thing, at the time the respondent testified that the check to Optical Matters was written, there were insufficient funds in his checking account to make payment on the full amount of the check. Only after the respondent's arrest were sufficient funds deposited in the account to make the check good. The fact that the most recent checks drawn on the respondent's account were supposedly written between January and March 1995, yet none was presented for payment until after the respondent was arrested, renders the respondent's story even less worthy of belief. The hearing board also found the testimony of respondent's wife "questionable" and that she "appeared anxious and uncomfortable" when asked about events in which she allegedly had personal knowledge.

Accordingly, the board determined "that the respondent, intentionally and without permission, took three pairs of eyeglass frames from Optical Matters and one pair from Optical Masters." The respondent thereby violated Colo. RPC 8.4(b) (committing a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects); Colo. RPC 8.4(c) (engaging in conduct involving dishonesty, fraud, deceit or misrepresentation); and C.R.C.P. 241.6(5) (violating the criminal laws of a state or of the United States constitutes ground for lawyer discipline).[2]

## II.

In light of the foregoing, the board recommended that respondent be suspended for six months. The hearing panel modified the board's recommendation of a six-month suspension to a longer suspension of one year and one day. The hearing panel supported its action by stating that "the respondent offered implausible and incredible testimony, and in denying misconduct, essentially testified falsely to the hearing board."

Under the ABA *Standards for Imposing Lawyer Sanctions* (1991 & Supp.1992) (ABA *Standards*), in the absence of mitigating factors, disbarment is generally appropriate when "a lawyer engages in serious criminal conduct a necessary element of which includes intentional interference with the administration of justice, false swearing, misrepresentation, fraud, extortion, misappropriation, or theft...." *Id.* at 5.11(a). Similarly, C.R.C.P. 241.16(e) defines "serious crime" for the purposes of lawyer discipline as: "(1) Any felony; and (2) Any lesser crime a necessary element of which, as determined by its statutory or common law definition, involves interference with the administration of justice, false swearing, misrepresentation, fraud, willful extortion, misappropriation, or theft...."

Our prior cases would nevertheless support a suspension under these facts rather than disbarment. *See, e.g., People v. Eastepp,* 884 P.2d 305, 308 (Colo.1994) (lawyer suspended for three months for violating felony theft statutes in conjunction with considerable mitigating factors); *People v. Koller,* 873 P.2d 761, 763 (Colo.1994) (lawyer suspended for one year and one day for violating fraudulent conveyance statute); *People v. Phelps,* 837 P.2d 755, 759 (Colo.1992) (lawyer suspended for one year and one day for violating equity-skimming statute, a class 5 felony); *see also People v. Kolbjornsen,* 917 P.2d 277, 279 (Colo.1996) (testifying falsely under oath warranted one year and one day suspension, especially where lawyer gave false testimony at disciplinary hearing).

In aggravation, the hearing board found that the respondent had a dishonest or selfish motive, *see* ABA *Standards* 9.22(b); the respondent's conduct constituted a pattern of misconduct, *see id.* at 9.22(c), and multiple

---

**2.** Section 18–4–401, 8B C.R.S. (1986 & 1995 Supp.), which has since been amended, provided in part:

> **18–4–401. Theft.** (1) A person commits theft when he knowingly obtains or exercises control over anything of value of another without authorization, or by threat or deception, and:

> (a) Intends to deprive the other person permanently of the use or benefit of the thing of value....

> ....

> (2) Theft is:

> ....

> (c) A class 4 felony if the value of the thing involved is four hundred dollars or more but less than fifteen thousand dollars....

offenses, *see id.* at 9.22(d); the respondent submitted false statements during the disciplinary process, *see id.* at 9.22(f); respondent has refused to acknowledge the wrongful nature of his conduct, *see id.* at 9.22(g); the respondent has substantial experience in the practice of law, *see id.* at 9.22(i); and he has been indifferent to making restitution, *see id.* at 9.22(j).

The respondent also has a history of discipline. *See id.* at 9.22(a). He was suspended for one year and one day from the practice of law in 1989 for his conduct in representing himself in a dissolution proceeding, including his personal attacks on other lawyers in the proceeding, violation of court orders, and dilatory conduct for the sole purpose of delay. *See People v. Barnthouse,* 775 P.2d 545 (Colo.1989). We note, as did the hearing board, that the respondent's testimony in the 1989 case was "not credible." *Id.* at 548. The respondent recently received a public censure for being convicted of disorderly conduct and for failing to report that conviction. *See People v. Barnthouse,* 941 P.2d 916, 919 (Colo.1997). The disorderly conduct charge arose out of the respondent's arrest for theft in 1992. *See id.* at 917.

The only mitigating factor that the board found was that the respondent's 1989 suspension was remote in time. *See* ABA *Standards* 9.32(m).

Because of the aggravating factors, especially the respondent's prior history and his submission of false evidence in this proceeding,[3] it is a close question whether any period of suspension, rather than disbarment, will be an adequate sanction to protect the public. Nevertheless, we accept the hearing panel's recommendation that the respondent be suspended for one year and one day, together with the automatic requirement that the respondent must petition for reinstatement and prove by clear and convincing evidence that he is rehabilitated and once again fit to practice law. One member of the court would impose a greater sanction.

### III.

Accordingly, it is hereby ordered that William J. Barnthouse be suspended from the practice of law for one year and one day, effective thirty days after this opinion is issued. The respondent is also ordered to pay the costs of this proceeding in the amount of $1,452.45 to the Supreme Court Grievance Committee, 600 Seventeenth Street, Suite 920–S, Denver, Colorado 80202, within thirty days of the date on this opinion. Furthermore, the respondent shall not be reinstated until he has complied with C.R.C.P. 241.22(b)–(d).

BENDER, J., does not participate.

---

3. The complaint in this case naturally did not charge the respondent with submitting false evidence in the disciplinary proceeding itself. Submitting false evidence and testifying falsely under oath are themselves additional disciplinary violations, and in a proper case may be the subject of separate disciplinary, or criminal, proceedings. For example, section 18–8–502, 6 C.R.S. (1997) provides:

> **18–8–502.** Perjury in the first degree. (1) A person commits perjury in the first degree if in any official proceeding he knowingly makes a materially false statement, which he does not believe to be true, under an oath required or authorized by law.
>
> (2) Knowledge of the materiality of the statement is not an element of this crime, and the defendant's mistaken belief that his statement was not material is not a defense, although it may be considered by the court in imposing sentence.
>
> (3) Perjury in the first degree is a class 4 felony.

Colo. RPC 3.3 provides in relevant part:

> (a) A lawyer shall not knowingly:
>
> (1) make a false statement of material fact or law to a tribunal;
>
> (2) fail to disclose a material fact to a tribunal when disclosure is necessary to avoid assisting a criminal or fraudulent act by the client;
>
> . . .
>
> (4) offer evidence that the lawyer knows to be false. If a lawyer has offered material evidence and later learns that the evidence is false, the lawyer shall take reasonable remedial measures.
>
> (b) The duties stated in paragraph (a) continue to the conclusion of the proceeding, and apply even if compliance requires disclosure of information otherwise protected by Rule 1.6.
>
> (c) A lawyer may refuse to offer evidence that the lawyer reasonably believes is false.